11 THIBODEAUX, Judge.
Defendant, National Affiliated Investors Life Insurance Co., appeals a trial court judgment rendered against it in an action for fraud brought by plaintiffs, Glenwood and Maffie Landreneau. The trial judge found defendant’s actions in |2selling a purported investment contract to plaintiffs to be fraudulent. The contract was rescinded and attorney’s fees in the amount of $10,000.00 were awarded.
For the following reasons, we affirm.
*465 I.

ISSUES

The issues presented in this appeal are the following:
(1) whether the trial court erred in finding that defendant, National Affiliated Investors Life Insurance Co., committed an act of fraud; and,
(2) whether the trial court erred in awarding attorney’s fees against defendant.
II.

FACTS

On June 13,1988, plaintiffs, Glenwood and Maffie Landreneau, purchased a contract entitled the Financial Lifetime Accumulator Contract, hereafter referred to as FLA-100, from Marie Jenke, a sales representative of National Affiliated Investors Life Insurance Company, hereafter referred to as NAIL. It was upon the recommendation of Pat Fonte-not, a co-worker of Mr. Landreneau, that the couple contacted Ms. Jenke. The Landre-neaus expressed to Mr. Fontenot, and later to Ms. Jenke, that they were interested in investing in a retirement program since Mr. Landreneau’s employer did not offer any retirement package. They did not state an interest in purchasing life insurance since Mr. Landreneau already had a life insurance policy with Louisiana Farm Bureau.
The FLA-100 is described in the sales brochure as a special insurance contract that allows the holder to share in the profits of the company. Although the Landreneaus were not interested in obtaining more life insurance, they agreed to |3purchase the FLA-100 after hearing Ms. Jenke’s sales pitch. Ms. Jenke explained to the Landre-neaus that the purpose of purchasing the FLA-100 was not to obtain more life insurance; it was to create a retirement investment. The FLA-100 was referred to by Ms. Jenke and in the sales materials as a contract, not a life insurance policy.
Specifically, the sales brochure which Ms. Jenke presented to the Landreneaus stated that the FLA-100 contract was created to provide the three following benefits: (1) generate growth for the company; (2) accumulate money for the holder of the policy and his or her family in return for helping the growth of the company; and, (3) supplement presently held insurance policies. The sales brochure further stated that the owner of the FLA-100 contract would share in fifty percent (50%) of the company’s total profits. Moreover, the contract holders are referred to as “enthusiastic boosters” and “partners” who help the company grow and succeed. Mr. Landreneau testified that he based his decision to purchase the FLA-100 in part on the information provided in this brochure.
Mr. Landreneau purchased three contracts in his wife’s name and three in his son’s name. In the second and third years after purchasing the FLA-100, the Landreneaus received satisfactory dividends from NAIL. Because they did not receive any dividends in the fourth year, they contacted NAIL. The company sent representative Pat Hebert to the couple’s home to explain the recent developments. Mr. Hebert stated that no dividends were paid out that year since NAIL no longer sold the FLA-100 contracts and there were no profits. Mr. Hebert also indicated that it was likely that NAIL would again pay out dividends comparable to those previously received by the Landreneaus.
According to Mr. Landreneau’s testimony, the couple contacted NAIL approximately two years after Mr. Hebert’s visit since they still had not received any ^dividends. Company representative Richard Kise came to the Landreneaus’ home. He informed the couple that due to the company’s reorganization, holders of the FLA-100 contracts would no longer be sharing in the profits of the entire company, but merely sharing in the profits generated by the FLA-100 contract group. Mr. Landreneau testified that he did not receive any information from NAIL regarding the reorganization of the company and its decision to discontinue dividend payments. Ed Carroll, president and chief executive officer of NAIL, testified that every stockholder and policyholder was notified through a mail publication of the changes and invited to meet with board members in various cities as they traveled through the state on an informational tour blitz. Mr. *466 Carroll stated, however, that no individual letters were sent out.
Approximately one year after Mr. Rise’s visit, the Landreneaus stopped their monthly payments on the FLA-100. At that point, the couple had invested $26,860.00 in the contracts. On May 10, 1995, the Landre-neaus filed suit against NAIL alleging fraudulent misrepresentation. After a trial on the merits, the trial court issued a judgment on June 6,1996 ordering NAIL to pay the Lan-dreneaus the amount they invested with that company as well as $10,000.00 in attorney’s fees.
III.

LAW AND ARGUMENT

Appellant NAIL first argues that the trial court erred in finding that it committed an act of fraud. Louisiana Civil Code article 1953 provides the following definition of fraud:
Fraud is a misrepresentation or a suppression of the truth made with the intention either to obtain an unjust advantage for one party or to cause a loss or inconvenience to the other. Fraud may also result from silence or inaction.
IsLouisiana Civil Code Article 1957 states that the claimant in an action for fraud need only prove the fraud by a preponderance of the evidence; circumstantial evidence is sufficient to establish fraud. Once fraud is established, the party responsible for the fraudulent activity is liable for damages and attorney’s fees. La.Civ.Code art.1958.
Regarding NAIL’s representation of the FLA-100, the trial judge stated in his reasons for judgment that “the whole scheme appears to have been crafted in a manner to defraud.” The trial judge based its conclusion to cast judgment against NAIL on its review of the evidence, namely the sales materials used by the company, and the witnesses’ testimony. NAIL contends that the trial judge committed manifest error in his findings and urges this court to reverse the trial court judgment. We will review this case abiding by the routinely applied manifest error standard of review. Our supreme court in Rosell v. ESCO 549 So.2d 840, 844 (La.1989), underscored the deference an appellate court owes to a trial court’s findings in stating,
[A] court of appeal may not set aside a trial court’s or a jury’s finding in the absence of “manifest error” or unless it is “clearly wrong,” and where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable, (citations omitted.)
Thus, unless we find that the trial court made a finding unreasonably incongruous to the facts in this case and the applicable law, this court shall affirm its judgment.
The true nature of the FLA-100 is disputed. NAIL asserts that it is primarily a life insurance policy whereas the Landreneaus assert it is primarily an investment contract. The FLA-100 is indeed a strange alchemy of both life insurance policy and investment contract which, according to the trial judge, requires a certain level of discernment to interpret. He stated in his reasons for judgment that “[t]here is no way that the plaintiffs could have detected what was going on by ordinary 16attention and the court specifically finds that the plaintiffs did not possess the special skills required to ascertain the truth without extreme difficulty.” In essence, the trial judge found that the sales materials and pitch used to promote the FLA-100 were designed in a manner to defraud unsuspecting purchasers. We agree.
The sales brochure cleverly avoids referring to the FLA-100 as a “life insurance policy” per se, opting for such language as “unique participating profit sharing life insurance contract.” When delivering her sales pitch to the Landreneaus, sales representative Marie Jenke followed suit by consistently referring to the FLA100 as a contract, not a policy. The Landreneaus knew that they were purchasing a form of life insurance, but as they understood the FLA-100, the policy was merely secondary, i.e., it was merely the investment means, not the end. The Landreneaus had no intentions of buying more life insurance for, as Mr. Lan- *467 dreneau testified, he already had a policy with Louisiana Farm Bureau and would have dealt with that agency for more insurance instead of seeking out an unfamiliar company.
The Landreneaus relied in part on the sales materials in making their decision to purchase. They thought that in purchasing FLA-100 contracts they would share in “no less than 50% of the total statutory profits of the company each year” as the brochure touted. Moreover, they believed that the FLA-100 was created to: (1) generate growth for the company; (2) accumulate money for them and their family; and (3) supplement their existing insurance policy, for that is what was stated in the NAIL brochure. In fact, it was the alleged profit sharing and the three-tiered goal of the FLA-100 that allowed NAIL to boast that “[t]he FLA cannot be compared with standard life insurance.”
After reviewing the sales materials and the Landreneaus’ and Ms. Jenke’s testimonies regarding the sales pitch and subsequent purchase, this court |7Ünds the trial judge’s conclusion that NAIL fraudulently misrepresented the FLA-100 contract to be eminently reasonable. Moreover, we find NAIL’s assertion that the Landreneaus were simply unsatisfied with their policy and wanted a return of their premiums galling to our sensibilities. At the time of purchase, the Lan-dreneaus stated that they wanted to invest money for retirement. In total they paid over $26,000.00 to NAIL, expecting to see a return on their investment as set forth by NAIL through its representatives and sales materials. Changing dividend payment schedules midstream after taking investors’ money without personal notification to those investors, as NAIL did in this case, constitutes bad faith and is demonstrative of the company’s fraudulent intent.
Secondly, NAIL argues that the trial court erred in assigning it attorney’s fees. Having determined that NAIL’s actions in this case constitute fraud as defined by La. Civ.Code art. 1953, this assignment of error can quickly be addressed. La.Civ.Code art. 1958 states that “[t]he party against whom rescission is granted because of fraud is liable for damages and attorney’s fees.” Accordingly, we find the trial judge’s award of attorney’s fees proper. As to the amount of $10,000.00, we defer to the trial judge’s determination and abide by the well-settled principle that regarding the award of attorney’s fees, the trial court has much discretion. Sharbono v. H & S Const. Co., 478 So.2d 779 (La.App. 3 Cir.1985).
IV.

CONCLUSION

For the foregoing reasons, the judgment of the trial court is affirmed.
AFFIRMED.